```
                  UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW HAMPSHIRE


J.P.E.H., by his parent and
next friend, Elizabeth Campbell,
     Plaintiff

     v.                                Civil No. 07-cv-276-SM
                                       Opinion No. 2009 DNH 098
Hooksett School District,
     Defendant
```

**O R D E R**

In a previous order, the court directed both parties to submit narrative factual statements and decision memoranda, with the proviso that plaintiff ("Campbell") could elect to have the pleading filed as document no. 69 serve as her factual statement, by informing the court of her intent to do so.  The Hooksett School District ("School District") has filed a narrative statement of facts.  Campbell has not, nor has she elected to have document 69 serve that purpose.  The School District has filed a decision memorandum.  Campbell has not, but she has filed a document titled "Plaintiff's Decision Memorandum Response," and a second document titled "Motion in Opposition to Hooksett School District Memorandum if it Becomes Judgment."[1]

---

[1] Campbell characterizes her "Motion in Opposition," as a preemptive motion for relief from a final judgment, under Rule 60(b) of the Federal Rules of Civil Procedure, filed in anticipation of the court's entering judgment in favor of the School District.

**Standard of Review**

As the party challenging the Hearing Officer's decision, Campbell has the burden of proof. Sch. Union No. 37 v. Ms. C., 518 F.3d 31, 35 (1st Cir. 2008) (citing Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992)).

In its seminal IDEA opinion, the United States Supreme Court explained:

> [A] court's inquiry in suits brought under [20 U.S.C.] § 1415(e)(2) is twofold.  First, has the State complied with the procedures set forth in the Act.  And second, is the individualized educational program [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982) (footnotes omitted).  "More recent decisions in this Circuit indicate that the first part of this test is more instructive than dispositive and that compliance with the second part is likely to nullify a violation of the first part." Sanford Sch. Comm. v. Mr. & Mrs. L., No. 00-CV-113, 2001 WL 103544, at *6 (D. Me. Feb. 1, 2002) (citing Town of Burlington v. Dep't of Educ., 736 F.2d 773, 788 (1st Cir. 1984)).

"When the district court reviews the administrative ruling [in an IDEA case], it exercises its discretion, informed by the record and by the expertise of the administrative agency and the school officials, as to how much deference to afford the administrative proceedings." Sch. Union 37, 518 F.3d at 35 (citing Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993); Hampton Sch. Dist., 976 F.2d at 52). "Judges are not trained pedagogues, and they must accord deference to the state agency's application of its specialized knowledge." Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008) (citing Renner v. Bd. of Educ., 185 F.3d 635, 641 (6th Cir. 1999)). Accordingly, "judicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." Lessard, 518 F.3d at 24 (citing Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)). "In the end, the judicial function at the trial-court level is one of involved oversight, and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Sch. Union 37, 518 F.3d at 35 (quoting Lenn, 998 F.2d at 1087).

### Background

Campbell is the mother of J.P.E.H., who was, at all times relevant to this matter, a student in the Hooksett School

District. In October of 2003, during her son's first-grade year, Campbell requested that he be tested, due to her concerns about his articulation and expressive language skills. He was tested and, as a result, was identified as a student eligible for special education under the code of "speech language impaired." A team was assembled, and an IEP developed. That IEP included, on a weekly basis, sixty minutes of speech/language therapy and ninety minutes of special-education language-arts instruction in the resource room. At the beginning of J.P.E.H.'s second-grade year, at Campbell's request, the IEP team amended J.P.E.H.'s IEP to remove resource-room assistance, which was the only specially designed instruction in his IEP. Before J.P.E.H.'s third- and fourth-grade years, Campbell specifically requested that her son receive no treatment different from that afforded his peers.

J.P.E.H.'s IEP for 2005-06, his third-grade year, initially contained a provision requiring his teachers to send home a bi-weekly syllabus, but "[a]t the October 31 parent conference Ms. Campbell said it [was] no longer necessary to send home the bi-weekly syllabus [and the] IEP [was] amended to omit that provision." (Administrative Record (hereinafter "R.") at 277.)

During the process of drafting J.P.E.H.'s fourth-grade IEP, Campbell "request[ed] frequent communication from the educational

4

team about the content of the weekly curriculum . . . so that she can reinforce instruction . . . at home." (R. at 297.)[2] Accordingly, the fourth-grade IEP provided: "Classroom teacher(s) and specialists (e.g. health) will provide parent with information about concepts, topics for discussion/instruction, key vocabulary and/or copies of reading selections in the areas of science, social studies and health in advance or concurrent with instruction." (R. at 302.) That IEP, to which Campbell gave her informed consent (R. at 305), listed one area of concern, communication, and within that area, listed one annual goal supported by seven objectives. (R. at 303-04.)

In late 2006, Campbell challenged the measurability of the goal and objectives in the fourth-grade IEP. By January of 2007, the IEP team proposed amendments addressing that issue. In early February, through her attorney, Campbell agreed that the IEP's goal and objectives, as amended by the IEP team, were measurable.

Regarding the IEP provision requiring frequent communication from the educational team, J.P.E.H.'s teachers sent home

---

[2] In an undated document titled "IEP Parent Input Form," that appears to pertain to the preparation of J.P.E.H.'s fourth-grade IEP, Campbell requested a "syllabus for the first 6 weeks of school," "[n]otification of any additional courses (no surprises)", and a "list of courses being taught and times/teacher name." (R. at 292.)

information in accordance with the IEP from the start of the 2006 school year. Campbell was not satisfied with the form and/or content of the information she was sent and made frequent requests for a "syllabus." In response to Campbell's requests and, she says, her hiring a lawyer, the school changed the format of the information it sent home with J.P.E.H. regarding his curriculum. She was satisfied with that new format, the so-called "week-at-a-glance," and continued to receive information in that format until the end of J.P.E.H.'s fourth-grade year.

In late 2006, J.P.E.H. was due for a triennial reevaluation of his status as a child with an educational disability. The School District proposed that he be given the same battery of tests he had been given in 2003 that had identified him as having an educational disability. Campbell agreed to that testing regimen. Based on the results of the 2006 tests, as well as his classroom performance, J.P.E.H.'s educational team determined that he no longer had an educational disability and, therefore, was no longer in need of special education. The team did, however, recommend that J.P.E.H. be provided a 504 plan to address his attention deficit hyperactivity disorder.

Thereafter, Campbell filed a complaint with the New Hampshire Department of Education ("DOE") challenging the

6


determination that J.P.E.H. was no longer eligible for special education, and seeking an order directing the School District to provide her with a "syllabus" for her son.  Subsequently, she filed an amended complaint alleging a deficiency in one of the goals in J.P.E.H.'s IEP.  The School District filed its own complaint, seeking affirmance of its determination that J.P.E.H. no longer qualified for special education.

At a prehearing conference, Campbell, through counsel, agreed that the IEP's parental-notification provision was being met, and stipulated that the only issue for the hearing was whether the School District had correctly determined that J.P.E.H. was no longer eligible for special education.  The two complaints were consolidated and a hearing was held.  In his opinion and order, the DOE Hearing Officer determined that Campbell did not meet her burden of proving that the School District failed to provide J.P.E.H. with a free appropriate public education ("FAPE") by failing to develop or properly implement his IEP, and that the School District met its burden of proving that J.P.E.H. no longer qualified as a child with a disability.

Campbell filed this action in August of 2007, and enrolled J.P.E.H. in private school for the 2007-08 school year.

**Discussion**

As explained in an earlier order (document no. 38), what remains of this case is Campbell's claim for tuition reimbursement.

In <u>School Committee of Burlington v. Department of Education of Massachusetts</u>, 471 U.S. 359 (1985), the Supreme Court construed the IDEA provision that "authorized a court to 'grant such relief as the court determines is appropriate,' " <u>Forest Grove Sch. Dist. v. T.A.</u>, 557 U.S. ___, ___, 2009 WL 1738644, at *5 (June 22, 2009) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)), and "held that the provision's grant of authority includes 'the power to order school authorities to reimburse parents for their expenditures on private special-education services if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act,' " <u>Forest Grove</u>, 2009 WL 1738644, at *5 (quoting <u>Burlington</u>, 471 U.S. at 369).  In <u>Forest Grove</u> the Court characterized its <u>Burlington</u> holding in the following way: "We have previously held that when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education." <u>Forest Grove</u>, 2009 WL 1738644, at *2.  On the other hand, however, the IDEA

> does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

20 U.S.C. §1412(a)(10)(C)(i). As the court of appeals for this circuit has explained:

> Although reimbursement of parental expenses for private residential placements sometimes is available under the IDEA, such reimbursement is contingent upon a showing that the parents diligently pursued the provision of appropriate services from the public school system, yet the school system failed to provide those services; and that the private placement is a suitable alternative. See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12 (1993); Burlington Sch. Comm., 471 U.S. at 370. When the parents make a unilateral choice, they must bear the associated risk: if the conditions for reimbursement are not met, the financial burdens are theirs. Burlington Sch. Comm., 471 U.S. at 373-74.

C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 289 (1st Cir. 2008) (parallel citations omitted).

Based on relevant law, the dispositive question in this case is whether J.P.E.H. was denied a FAPE. If he was, then, perhaps, Campbell might be entitled to tuition reimbursement. If he was not, then Campbell has no right to tuition reimbursement.

In his order, the Hearing Officer considered three issues relevant to determining whether J.P.E.H. had been denied a FAPE: (1) the content of his IEP; (2) the implementation of his IEP; and (3) the 2006 determination that he was no longer eligible for special education.  The Hearing Officer did not err in his consideration of any of those three issues.

### 1. IEP Content

Notwithstanding her previous consent to J.P.E.H.'s fourth-grade IEP, Campbell claims that her son was denied a FAPE because the goal and the objectives in his IEP were not sufficiently measurable.  The record demonstrates, however, that once Campbell raised the issue of measurability, the IEP team proposed amendments to the IEP that added measurability to the goal and objectives, and that Campbell's counsel agreed that the proposed amendments resolved the measurability issue.  Thus, the court cannot say that the Hearing Officer erred in ruling that J.P.E.H.'s "IEP contain[ed] a measurable goal and objectives, and [was] reasonably calculated to enable him to benefit from his education."  Accordingly, Campbell's claims about the content of her son's IEP provide no basis for determining that he was denied a FAPE.  See Lessard, 518 F.3d at 23-24 (describing the legal standard for evaluating the adequacy of an IEP).

### 2. IEP Implementation

Campbell also claims that J.P.E.H. was denied a FAPE because of the School District's failure to provide her with a syllabus. The record, however, supports the Hearing Officer's finding that from the start of the 2006-07 school year, the School District provided Campbell information about J.P.E.H.'s instructional program in a manner that was consistent with the requirements of his fourth-grade IEP. Moreover, the record demonstrates that notwithstanding the adequacy of its notification procedure, the School District altered its format, at Campbell's request, and that the new format, the week-at-a-glance, was satisfactory to Campbell. Accordingly, Campbell's claims about the implementation of her son's IEP provide no basis for determining that he was denied a FAPE.

### 3. Determination of Ineligibility for Special Education

Finally, Campbell claims she was, in essence, forced to enroll J.P.E.H. in private school because he would have been denied a FAPE in the public school he was attending as a result of the School District's determination that he no longer qualified for special-education services. She challenges both aspects of the 2006 reevaluation — the formal testing, and reports of J.P.E.H.'s classroom performance. The record supports the Hearing Officer's ruling that J.P.E.H. no longer qualifies as

11

a child with a disability.  Formal testing showed adequate improvement in the areas that initially qualified him for special education.  Moreover, at his mother's request, J.P.E.H. last received specially designed instruction when he was in the second grade, but his classroom performance demonstrates that he was able to benefit from his education even without such instruction.  Because Campbell has produced no evidence to counter the test results and the academic performance records on which the School District relies, there is no merit to her claim that J.P.E.H. would have been denied a FAPE as a result of the School District's determination that he no longer qualified as a child with a disability within the meaning of the IDEA.

## Conclusion

For the reasons given, plaintiff's requests for relief are denied, as is her "Motion in Opposition" (document no. 84).  The order of the Hearing Officer is affirmed.  The clerk of court shall enter judgment in favor of defendant and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

June 30, 2009

cc: Elizabeth J. Campbell, <u>pro se</u>
 Anthony I. Blenkinsop, Esq.
 Melissa A. Hewey, Esq.
 Jeanne M. Kincaid, Esq.